Filed 4/1/15  P. v. Murray CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>TERRANCE EDWARD MURRAY,<br><br>    Defendant and Appellant. | C070936<br><br>(Super. Ct. No. SF109498A) |

Defendant Terrance Edward Murray appeals after conviction upon a plea of no contest to residential burglary (Pen. Code, § 459, count 1; unless otherwise stated, statutory section references that follow are to the Penal Code); two counts of residential robbery (§ 211, counts 2 and 3); threatening a witness (§ 140, count 4); carjacking (§ 215, subd. (a), count 5); and unlawfully driving or taking a vehicle (Veh. Code, § 10851, subd. (a), count 6).  He also pleaded no contest to various enhancements, including personal use of a firearm during the commission of the offenses.  (§§ 12022.5, subd. (a), 12022.53, subd. (b).)  The court sentenced defendant in accordance with the plea bargain to 15 years in state prison, consisting of the middle term of five years on count 5 (§ 215, subd. (a))

1

plus an additional 10 years for the personal use of a firearm. (§ 12022.53, subd. (b).) The court imposed concurrent sentences on the remaining charges and enhancements.

Defendant raises three contentions on appeal. First, he claims the trial court erred in denying his motion to withdraw his plea because alleged mental deficiencies rendered his plea involuntary and his counsel was ineffective representing him during the plea. Next, he contends the court denied him the fundamental right to be present when the court imposed sentence. Finally, pursuant to section 654, he argues the court should have stayed the sentences on count 1 and its enhancement as well as on count 6.

We find neither an abuse of discretion in denying defendant's motion to withdraw his no contest plea nor ineffective representation when the plea was taken. We also conclude any alleged error in sentencing defendant in his absence was harmless on this record. We do agree, however, that section 654 mandates that the sentences on count 1 and its enhancement and on count 6 be stayed to avoid the prohibition against multiple punishments. We shall direct the trial court to modify the judgment so that the sentence on count 1 for burglary and the enhanced term provided in section 12022.5, subdivision (a), as well as the sentence on count 6 for unlawfully taking a vehicle are stayed pursuant to section 654. As so modified, we affirm.

FACTS AND PROCEEDINGS

In 2004, Jeffrey Jones shot Dewayne Jackson when Dewayne tried to break up a barroom brawl. Because Dewayne Jackson and his brother, Dwight Jackson, share the same surname, we will refer to them by their first names. Dewayne was paralyzed by the shooting and is confined to a wheelchair. Subsequently, Dewayne testified against Jones at Jones' criminal trial and Jones was sentenced to 44 years in prison.

Approximately four years later, on September 12, 2008, Dewayne and his brother Dwight went to a house in Stockton where Dewayne's friend, Mario, ran a makeshift

2

barbershop. Several people were there when they arrived, including defendant and his friend Anthony Crosby.

Dewayne greeted everyone, but defendant would not respond. After speaking with someone on his cell phone, defendant left the room and went outside. Dewayne, Dwight, and Crosby, along with two others, stayed in the house. Defendant returned 30 minutes later carrying two guns, described as a black .9 millimeter semiautomatic and a black .22 caliber gun, and pointed the guns directly at Dewayne.

Defendant told Dewayne he was "sorry for [Dewayne's] situation," but that defendant's brother had shot Dewayne and Dewayne had sent him to prison for 44 years by testifying against him. Defendant ordered Dewayne to "give up everything." Dewayne threw a necklace chain, a small amount of cash and a gold grill (caps for his teeth) from his mouth on the floor. Defendant ordered Crosby to retrieve the items.

Defendant then turned the guns on Dwight, checked his pockets, and told Dwight to give up whatever he had. Defendant took Dwight's car keys, wallet, two cell phones, and his Army dog tags, and handed the items to Crosby. Defendant walked to the door, told Dewayne, "You're going to get yours," and then left. Crosby left as well.

Dwight ran to the front door of the house and saw defendant and Crosby talking near Crosby's car. Dwight peeked out the front door and asked defendant if he was going to steal his car. Defendant responded yes. Dwight asked him not to steal his car and defendant asked Dwight to come outside to speak with him. Given that defendant had two guns, Dwight refused. Defendant then looked inside Dwight's car, opened the door and motioned for Crosby to drive off in his own car. Defendant then got into Dwight's car and drove away. Dwight called the police to report the stolen vehicle.

The following day, as Dwight was leaving a retail establishment parking lot, he saw Crosby drive into the lot. Dwight called the police and later law enforcement stopped the car Crosby was driving. Dwight picked both Crosby and defendant from a photographic lineup as the people who robbed him.

3

During preliminary hearing proceedings approximately two months later, defendant's father delivered a pillow case containing two pellet guns to the office of defendant's counsel. His father claimed he received the pellet guns from defendant's cousin, who had purportedly gotten the guns from defendant the day before his arrest.

An information filed in November 2008 charged defendant with first degree residential burglary (§ 459, count 1), two counts of first degree residential robbery (§ 211, counts 2 and 3), threatening a witness (§ 140, count 4), carjacking (§ 215, subd. (a), count 5), and the unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a), count 6). Various firearm enhancements were also alleged. (§ 12022.5, subd. (a) and 12022.53, subd. (b).)

A month later, in December 2008, the court suspended criminal proceedings pursuant to section 1370 to determine defendant's mental competence. Over the course of the next several months, the court appointed four different doctors to evaluate defendant.

Dr. Chellsen assessed defendant in January 2009 and found him competent to stand trial. In Dr. Chellsen's opinion, defendant was malingering, exaggerated his mental deficiencies, and had "considerably more understanding of the nature and purpose of the proceedings pending against him than he is willing to acknowledge." In diagnosing defendant as malingering, Dr. Chellsen noted, "[defendant] failed all of the malingering screening tests administered to him, which strongly supports the contention that he is exaggerating the extent of his deficits, since even individuals with significant developmental disabilities perform reasonably well on these."

In February 2009, Dr. Phillips, a clinical psychologist, reported that defendant did not meet the criteria for a diagnosis of Mental Retardation as his scores on tests measuring his cognitive abilities were in the average range and his Full Scale IQ was 95. Dr. Phillips did note, however, that defendant was experiencing psychiatric symptoms at

4

that time. A month later Dr. Phillips reiterated his determination that defendant did not have a developmental disability, noting defendant had received a high school diploma.

Dr. Cavanaugh evaluated defendant in March 2009 and concluded defendant was "clearly malingering mental illness" and that he was "capable of knowing and understanding the nature and purpose of proceedings taken against him." He therefore opined defendant was competent for trial. According to Dr. Cavanaugh's report, "[defendant] likely is not very cooperative with his attorney, but his malingered symptomatology and behavior are consciously produced."

Dr. Rogerson also assessed defendant in March. Dr. Rogerson diagnosed defendant with malingering. He concluded defendant was competent to stand trial and was able to rationally assist counsel if he so chose.

Dr. Weiss evaluated defendant in April 2009. Unlike Drs. Chellsen, Cavanaugh, and Rogerson, she found him incompetent to stand trial based on a lack of understanding of the charges against him. According to Dr. Weiss, defendant's thought process was coherent and goal directed, but he had little motivation to help himself in the legal process. Based on Dr. Weiss's report, in June 2009 the court found defendant incompetent to stand trial and committed him to the Department of Mental Health at Napa State Hospital.

In October 2009, Dr. Kokubun, a psychologist, evaluated defendant while at Napa State Hospital. He first considered whether defendant was experiencing psychiatric symptoms of a severity that would preclude his ability to understand legal proceedings or assist his attorney in presenting a defense. Dr. Kokubun concluded that defendant was feigning psychotic and cognitive symptoms since his reported symptoms were inconsistent from interviewer to interviewer, were atypical and not generally observed or reported with genuine psychosis, and were inconsistent with his observed behaviors.

Dr. Kokubun opined that defendant possessed the capacity to understand the nature of the criminal proceedings against him and had an adequate factual understanding

5

of his legal situation, but that he was "volitionally attempting to appear trial incompetent." "It [was] highly unlikely that [defendant] would have the ability to remember everyday information, but not have the ability to remember information only related to trial competency." Defendant's "selective and specific reported lack of knowledge and reported memory impairment as relates to court proceeding and his cases, combined with the test result suggesting feigning memory deficit, [was] highly suggestive of intentional minimization of his knowledge and understanding of the legal proceeding."

Based on Dr. Kokubun's report, Napa State Hospital filed a Certification of Mental Competency in November 2009. The court then appointed Dr. Weiss to reexamine defendant.

Dr. Weiss again opined that defendant was incompetent because he demonstrated a limited understanding of the charges against him and he would have significant difficulties rationally assisting his attorney. During their interview, defendant referred to his attorney as a witch who put hexes on people.

While Dr. Weiss considered the issue of malingering, she said there was limited information to support such a conclusion. But, Dr. Weiss did not have access to the reports from Drs. Chellsen, Cavanaugh, and Rogerson, who all diagnosed defendant as malingering. Nor did she have access to Dr. Kokubun's report from Napa State Hospital, which gave a detailed summary supporting the multiple malingering diagnoses.

In December 2009 the parties stipulated to submit the competency issue to the court based on Dr. Weiss's report. The court found defendant remained incompetent. He was returned to Napa State Hospital in April 2010.

In June 2010, Dr. Singh, a staff psychiatrist at Napa State Hospital evaluated defendant. Dr. Singh considered the possibility that defendant was experiencing psychotic symptoms as reported by Dr. Weiss, but concluded "with a reasonable degree of medical certainty" that defendant was "feigning psychotic and cognitive symptoms."

6

He based his conclusion on many of the same reasons cited by Dr. Kokubun, including inconsistent and atypical psychiatric symptoms and screening test scores in the malingering range. Like Dr. Kokubun, he opined that defendant had the capacity to understand the pending charges as well as the criminal proceedings against him, and that he had the ability to communicate clearly, recall past events and learn new information, make decisions, concentrate and answer questions directly, and cooperate with his attorney.

On July 26, 2010, Napa State Hospital filed a Certification of Mental Competency. The court found defendant competent pursuant to section 1372 and reinstated criminal proceedings.

On January 6, 2011, defendant pleaded no contest to all counts as part of a plea agreement. Prior to the change of plea, the court and the parties engaged in extensive discussions about the case. And at defendant's request, the prosecutor also met with defendant and his counsel for an hour and 40 minutes to discuss the terms of the plea.

Before taking the plea, the court explained that defendant could either accept the proffered terms or proceed to trial. When defendant responded that it seemed like he had no choice, the court said it would leave it up to him and acknowledged defendant was facing exposure with both good and bad points if he tried the case. The court informed defendant that he would receive a 15-year sentence under the deal, which would limit his potential exposure to a 30-year sentence. Defendant questioned why he was not entitled to another preliminary hearing after being deemed competent and also inquired about receiving the prosecutor's pre-preliminary hearing offer of 13 years.

The court then explained that the deal required defendant to plead "no contest," and that "no contest" meant defendant was admitting the offenses. Defendant responded that he understood. After the court told defendant he had to serve at least 85 percent of the sentence given the seriousness of the charges, defendant countered that he thought he was entitled to half time since it was his first offense and he did not have a record or any

7

strikes. His belief was based on discussions with other jail inmates. The court reiterated that he had to serve 85 percent and not half time and defendant said he understood. His attorney had also repeatedly advised him he would have to serve 85 percent of the sentence.

When the court told defendant he would have five strikes on his record by pleading to all charges, defendant said he thought he would receive 15 years and no strikes. The court told him no and defendant said he understood. Defendant later questioned how he could receive five strikes, and the court explained that burglary, robbery, robbery, carjacking, and intimidating a witness with the personal use of a firearm all qualified as strikes. Defendant commented that "that's crazy."

At that point, the following exchange took place between defendant and the court: "If you want to go to trial, all you've got to tell me is I don't want to do this. . . . You may win, you may lose. Like I told you earlier, I don't want any misunderstanding later. That's not a threat. It could go in your favor or it could go horribly against you. You heard the evidence. It's not like you didn't see it. . . . You know that there's evidence in the case and you know the extent of the evidence. What do you want to do?" Defendant responded, "I'm going to take the deal."

The court advised defendant that by pleading he was giving up the right to a judge or jury trial, the right to cross examine witnesses, the right to prove his innocence, his right to testify, the right against self incrimination, and his right to ask for less time or reopen the case or appeal. After each separate advisement, defendant affirmatively responded that he understood the rights he was giving up.

When asked how he wished to plead to count 1, defendant stated: "I don't even know what to say right now." His attorney told him to say "no contest," and he asked, "What that mean?" As the court did before, she said "no contest means I admit the charge." Defendant then said, "Yeah. No contest." When asked how he wished to plead

8

to the associated firearm enhancement, defendant asked his attorney if he should say the same thing and she nodded affirmatively. Defendant then stated, "No contest."

Defendant pleaded no contest to counts 2 through 4 and the alleged enhancements, reaffirmed he wanted to plead no contest to those charges and enhancements following a discussion about pleading pursuant to *People v. West* (1970) 3 Cal.3d 595, and finally pleaded no contest to count 5 and its corresponding enhancement and count 6. The court ordered a probation report and set the matter over for sentencing.

In March 2011, defendant requested a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to relieve his appointed counsel. After listening to defendant's concerns, the court denied his *Marsden* motion.

During the hearing defendant also asked to withdraw his plea. Claiming his counsel coerced him into taking the deal, and that he did not understand what was happening at the change of plea hearing, defendant sought to reopen his case. He again stated he did not understand how other jail inmates had received lesser sentences for allegedly more serious crimes. The court agreed to appoint a new lawyer for the sole purpose of filing a motion to withdraw his plea.

In January 2012, defendant moved to withdraw his plea pursuant to section 1018. At the hearing defendant tried to introduce newly discovered evidence, which consisted of a purported statement by Dewayne that someone other than defendant had robbed him. Defendant refused to address the plea withdrawal motion and would not respond to the court's repeated inquiries regarding whether he wanted to testify about the grounds for withdrawing his plea.

Although defendant claimed he did not understand, the court found otherwise given the length of time defendant had been in court, the plea transcript, the hour and 40 minutes he spent with the prosecutor, and his own attorney's motion to withdraw the plea. The court ultimately removed defendant from the courtroom for being obstreperous and difficult.

9

After defendant was removed from the courtroom, his specially-appointed counsel questioned his trial counsel, Ms. Bossi, about investigating the case, her contacts with defendant, and the circumstances surrounding the plea. While she believed defendant suffered from some form of mental retardation, and that they sometimes had difficulty communicating, in her opinion defendant understood the facts that had to be established to prove each of the charged offenses and understood the direct consequences of his plea. Although she believed he was "unhappy" about it, ultimately she believed defendant understood the plea and the purpose for entering into it.

The court found an absence of good cause to withdraw the plea. In denying the motion, the court noted the lengthy plea discussions and that the prosecution presented ample evidence of defendant's guilt during the preliminary hearing. Given the overwhelming evidence of defendant's guilt, it was likely he would have been convicted if the case proceeded to trial. Conviction would have meant "pretty much a life sentence in terms of thirty plus years," and defendant was aware of that fact. According to the court, "the plea amply reflect[ed] that [defendant] truly understood the gravity of the plea, that he understood why he was pleading, that he pled because it was in his own best interest to avoid a trial with a sentence that could be double that amount. And then he entered his plea knowingly, voluntarily and willingly in this case."

The court relieved defendant's special counsel, reappointed his trial counsel and sentenced him according to the negotiated disposition. Because defendant had previously been removed from the courtroom for being uncooperative, he was not present when the court pronounced the sentence. Pursuant to the plea agreement, the court sentenced defendant to a total determinate term of 15 years in state prison, imposed as follows: the middle term of five years on count 5, with an additional 10 years for the personal use of a firearm within the meaning of section 12022.53, subdivision (b). The court imposed the following concurrent sentences on the remaining offenses: on count 1, the middle term of two years, plus a four-year term for the personal use of a firearm (§ 12022.5, subd.

10

(a)); on counts 2 and 3, the middle terms of four years each, plus an additional 10 years each for the personal use of a firearm (§ 12022.53, subd. (b)); on count 4, the middle term of three years, plus an additional four years for the personal use of a firearm (§ 12022.5, subd. (a)); and, on count 6, the middle term of two years.

On April 20, 2012, defendant's former special counsel filed a notice of appeal and filed a request for a certificate of probable cause on defendant's behalf. The court granted the request.

DISCUSSION

I

*The Motion to Withdraw the Plea*

Defendant contends the trial court abused its discretion in denying his motion to withdraw his no contest plea because he suffered from diminished capacity and mental disabilities when he entered the plea. He also contends his counsel was ineffective in assisting him when the court took his plea.

Section 1018 allows a defendant to withdraw his guilty plea before the entry of judgment upon a showing of good cause. (*People v. Weaver* (2004) 118 Cal.App.4th 131, 145 (*Weaver*); (*People v. Cruz* (1974) 12 Cal.3d 562, 566 [where a defendant was represented by counsel at the time of the plea, the court has discretion whether to permit withdrawal of the plea upon a showing of good cause].)

Section 1018 provides, "[o]n application of the defendant at any time before judgment . . . the court may . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted." (§ 1018.) A defendant bears the burden of establishing good cause for such a withdrawal, based on clear and convincing evidence. (*Weaver, supra,* 118 Cal.App.4th at p. 145.) "Mistake, ignorance or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a guilty plea." (*People v. Cruz, supra*, 12 Cal.3d at p. 566.)

11

A trial court's denial of a motion to withdraw a guilty plea will not be disturbed unless abuse of discretion is shown. (*People v. Holmes* (2004) 32 Cal.4th 432, 442-443; *People v. Wharton* (1991) 53 Cal.3d 522, 585.) We "must adopt the trial court's factual findings if substantial evidence supports them." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) Pleas resulting from a bargain, moreover, " 'should not be set aside lightly and finality of proceedings should be encouraged.' " (*Weaver*, *supra*, 118 Cal.App.4th at p. 146.)

In the present matter, the trial court did not abuse its discretion in denying defendant's motion to withdraw his plea based on his purported mental deficiencies. Five of the six doctors who evaluated defendant's mental state and capacities over the preceding few years found that defendant was malingering regarding his purported mental defects and that he had a greater understanding of the nature and purpose of the proceedings against him than he admitted. According to Dr. Chellsen, defendant "failed all of the malingering screening tests administered to him, which strongly supports the contention that he is exaggerating the extent of his deficits, since even individuals with significant developmental disabilities perform reasonably well on these."

Similarly, one of his treating psychologists at Napa State Hospital noted, " 'During the group, his speech was clear and coherent, without evidence of distraction or disorganization or other signs or indications that he was hearing voices. Mr. Murray remembered the plea of "no contest" from the Court competency group he attended the previous day. During a discussion of evidence and how it is used in Court, when an argument about the merits of a particular football player were discussed as a metaphor for the Court process, Mr. Murray was able to state that he could use "statistics" as a form of evidence to support his argument.' " The report also concluded that defendant "retains an ability to communicate clearly," "to remember and recall things," "to learn new information," to "make decisions," and "to cooperate and follow instructions."

12

Another report from Napa State Hospital states defendant had "past experience with the legal system as he ha[d] numerous previous charges and convictions," and, therefore, it was unlikely defendant "lack[ed] familiarity with legal processes and procedures." The report also found that defendant's "thought process was consistently linear and goal-directed. His speech was coherent and clear. When he did not understand the question, he appropriately asked for a clarification (e.g., 'What does *X* mean?' 'I don't know that word')." Defendant demonstrated the ability to ask such clarifying questions during the change of plea hearing.

These medical evaluations support the trial court's finding that defendant did in fact understand the plea proceedings although he claimed otherwise.

While it is true that his trial counsel, Ms. Bossi, testified at the withdrawal hearing that she believed defendant was mentally retarded, she also acknowledged that trained medical professionals who evaluated defendant found otherwise. Indeed, those same professionals determined that defendant's cognitive testing "indicate[d] that all subscales were in the average range . . . ," and that defendant did "not have a developmental disability." And, although he had previously received special education classes, a report dated May 9, 2005, recommended that he "be exited from Special Education." He had also earned a high school diploma. In any event, even defendants with "borderline level[s] [of] intelligence"--a level that has been described as "just above the level that qualifies for mental retardation"-- have been found to possess the ability to validly waive various trial rights. (See e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1213 [defendant with borderline intelligence able to understand and waive his right to be present in courtroom].)

And even though Ms. Bossi and defendant may have had some difficulties communicating, she admitted they were able to work through those issues. In explaining defendant's alleged difficulty in understanding how he could be convicted of a firearm enhancement when he claimed he used only pellet guns, Ms. Bossi acknowledged that

13

many of her other clients similarly find it difficult to believe they could be convicted on eyewitness testimony alone even when no gun is found. In other words, the problem was not unique to defendant or his alleged mental deficiencies.

Ms. Bossi also testified that, in her opinion, defendant understood the factual basis of the charges and the nature of the facts that had to be proved regarding each element of the offenses. He understood the credits he would receive. Both she and the court advised defendant of his constitutional rights as well as the direct consequences of pleading no contest, and Ms. Bossi was satisfied that defendant understood the consequences of taking the plea. Although defendant may have been unhappy, she believed he "understood the plea and what was required to convict him and why he was entering the plea."

The record, moreover, reveals that the court, the prosecutor, and defense counsel spent a great deal of time explaining the plea agreement and defendant's rights to defendant prior to taking his plea. At defendant's request, the prosecutor did something he had never done before--he personally met with defendant and his counsel for an hour and 40 minutes to discuss the terms of the plea.

At the withdrawal hearing, the trial court specifically found that defendant did understand the proceedings although he claimed otherwise. As noted above, the record amply supports this factual finding. Nothing in this record convinces us that defendant's purported diminished capacity or mental disabilities prevented him from entering a voluntary plea. That defendant later regretted the decision does not mean the trial court abused its discretion in denying his motion to withdraw the plea. (*People v. Knight* (1987) 194 Cal.App.3d 337, 344 ["Postplea apprehension (buyer's remorse) regarding the anticipated sentence, even if it occurs well before sentencing, is not sufficient to compel the exercise of judicial discretion to permit withdrawal of the plea of guilty"].)

We also find meritless defendant's contention that Ms. Bossi failed to represent him effectively during the plea. To establish ineffective assistance of counsel, defendant

14

must show, by a preponderance of the evidence, that his counsel's representation fell below the standard of a competent advocate and a reasonable probability exists that, but for counsel's errors, the result would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) We presume that counsel's conduct fell within the "wide range of reasonable professional assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

In determining whether counsel's performance was deficient, we exercise deferential scrutiny and "assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act." (*Ledesma, supra,* 43 Cal.3d at p. 216.) "Although deference is not abdication [citation], courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212.)

Before permitting a client to foreclose all possibility of defense by submitting to conviction without a hearing, counsel has a duty to investigate carefully all defenses of fact and of law that may be available to the defendant and confer with him about them. (*People v. McCary* (1985) 166 Cal.App.3d 1, 8-9 [defendant's counsel did not satisfy threshold competency standards where he failed to determine a charged enhancement was invalid and failed to inform the defendant of this fact during plea negotiations].) Counsel is ineffective if he fails to perform these obligations and such failure results in the withdrawal of a potentially meritorious defense. (*People v. Maguire* (1998) 67 Cal.App.4th 1022, 1028.) "[W]here ineffective assistance of counsel results in the defendant's decision to plead guilty, the defendant has suffered a constitutional violation giving rise to a claim for relief from the guilty plea." (*Ibid.*)

The record on appeal does not disclose a basis for finding counsel failed to investigate either facts or law in the manner required of a reasonably competent diligent attorney, nor does the record establish that Ms. Bossi failed to fully communicate with

15

defendant about the plea and its ramifications. Rather, the record shows Ms. Bossi, a criminal attorney with over 20 years experience who had handled thousands of serious and violent felony cases, met with defendant several times and spoke with him telephonically on numerous occasions to discuss his case, possible defenses, and the evidence against him.

Ms. Bossi enlisted a private investigator to interview witnesses and to investigate the pellet guns defendant claimed he used during the incident. She had extensive negotiations with the prosecutor about whether the guns were real or pellet guns. She subpoenaed records and cross examined key witnesses during the preliminary hearing. She also attempted to interview Crosby, the codefendant who agreed to testify against defendant that the firearms he used were actual guns rather than pellet guns. She read Crosby's anticipated testimony to defendant and explained how damaging such testimony would be to his defense that the guns were not real, especially since both of the victims already testified the guns were real during the preliminary hearing.

During the change of plea hearing, Ms. Bossi explained legal terms in ordinary language which was easily understandable. For example, when defendant asked what the term "no contest" meant, she explained it meant to "admit" the charges. Such an explanation was given even though one of his treating psychologists found that defendant had previously understood the meaning of that precise phrase, and despite the court explaining the term several times during the same hearing.

She explained the credits to which defendant was entitled as well as the number of strikes defendant would receive by pleading no contest to the charges. She also repeatedly informed defendant he would have to serve at least 85 percent of his sentence. She explained the constitutional rights that defendant would be waiving by accepting the plea agreement.

Ms. Bossi's representation of defendant during the change of plea was more than adequate. Because his counsel was not ineffective, defendant cannot establish any constitutional violation warranting relief from his no contest plea.

## II

### *Defendant's Presence at Sentencing*

Defendant maintains that the trial court violated his statutory and constitutional rights by sentencing him to the terms of the negotiated disposition in his absence. We need not decide whether the court erred by imposing sentence without defendant present, however. Even assuming an error occurred, we find it harmless.

In a felony case, a criminal defendant has the statutory right to be present during the critical stages of trial, including when sentence is imposed. (§ 977, subd. (b)(1); 1043, subd. (a).) The federal and state constitutions also guarantee a criminal defendant's right to be personally present at trial. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15.) A defendant, however, does not have a right to be present at every hearing. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1234 (*Virgil*).) Instead, presence is required only if it bears a reasonable and substantial relation to a defendant's full opportunity to defend against the charges. (*Ibid.*) "The same analysis applies under article I, section 15 of the California Constitution." (*Id.* at p. 1235.) And " '[t]he standard under sections 977 and 1043 is similar.' " (*Ibid.*)

The defendant, moreover, must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial. (*Virgil, supra,* 51 Cal.4th at p. 1234.) For federal constitutional errors, the court applies the *Chapman* harmless beyond a reasonable doubt standard. (*People v. Davis* (2005) 36 Cal.4th 510, 532 [citing *Chapman v. California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705]].) "Error under sections 977 and 1043 is state law error only, and therefore is reversible only if ' "it is reasonably probable that a result more favorable to the appealing party would have

been reached in the absence of the error." ' " (*Id.* at pp. 532-533.) Because defendant must show prejudice from any purported violation of the right to be present, we turn to that issue first.

Here, defendant contends that had he been present for sentencing, he might have prevented the court from imposing concurrent sentences for burglary in count 1 and vehicle theft in count 6, which he argues should have been stayed under section 654. We conclude, however, that the trial court's alleged error in sentencing defendant without him being present was not prejudicial.

We note first of all that, in part III of this opinion, we correct the error about which defendant complains.

In any event, defendant had previously pleaded no contest to all of the charges and enhancements. Thus, the issue of defendant's guilt had already been settled. The court merely imposed the previously agreed upon disposition.

Defendant simply speculates that his presence *might have* prevented the alleged sentencing error which we shall momentarily correct. Mere speculation that defendant's presence would have contributed to his defense is insufficient to establish the requisite prejudice, however. (*People v. Waidla* (2000) 22 Cal.4th 690, 741-742 [speculation that defendant's personal presence was necessary or bore a reasonably substantial relation to a full opportunity to defend insufficient to establish right to be present].)

Finally, even if the court erred in imposing sentences for counts 1 and 6, the court imposed concurrent and not consecutive sentences for those offenses. As defendant concedes, "neither of those failures change[s] the length of the sentence." While the law does require that sentences be stayed to the extent section 654 prohibits multiple punishments, courts have recognized that "there appears to be little practical difference between imposing concurrent sentences . . . and staying sentence[s]" under section 654. (*People v. Jones* (2012) 54 Cal.4th 350, 353.) Such "little practical difference" evidences a lack of prejudice for purposes of defendant's absence from the sentencing hearing.

18

Thus, even if the court erred in sentencing defendant in his absence, we are convinced beyond a reasonable doubt that the alleged error was harmless. We therefore reject defendant's presence argument.

### III

### *Section 654*

Defendant contends the trial court erred by sentencing him concurrently for the burglary and vehicle theft offenses alleged in counts 1 and 6 because they were essential parts of the robberies and carjacking in counts 2, 3, and 5 for which the court already imposed sentence. Although he could be convicted of each offense, defendant argues section 654 precludes punishing him for both the robberies and burglary, and for the carjacking and vehicle theft. We agree.

Before turning to the merits, we first address respondent's contention that defendant forfeited the issue by failing to object to the sentence below. While it is true defendant did not raise section 654 when the court actually imposed the sentences following the hearing on defendant's motion to withdraw his plea, defense counsel did alert the court to potential section 654 issues during the change of plea hearing. At that time, the court acknowledged that section 654 might bar multiple punishments in this case, especially concerning the burglary and carjacking offenses.

In any event, even if defense counsel should have raised a section 654 objection at the sentencing hearing rather than at the change of plea hearing, we agree with defendant that the issue is not forfeited. "Errors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal." (*People v. Perez* (1979) 23 Cal.3d 545, 550, fn.3.) We thus address defendant's section 654 challenge.

Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that

19

provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute does not prohibit multiple convictions for the same conduct, only multiple punishments. (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.) "In such a case, the proper procedure is to stay execution of sentence on one of the offenses. [Citation.] The quoted language bars multiple punishment[s] where the convictions arise out of an indivisible transaction and have a single intent and objective. [Citations.] Whether a defendant did in fact have multiple objectives is generally a question of fact for the trial court, and its decision will be upheld on appeal if supported by substantial evidence." (*Ibid.*)

"The divisibility of a course of conduct depends upon the intent and objective of the defendant. If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations . . . . [Citations.] The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple. Each case must be determined on its own facts. [Citations.]" (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

In this case, defendant was punished concurrently for one count of burglary and two counts of robbery, one for each victim. A person is guilty of burglary whenever he enters a house with the intent to commit larceny or any felony. (§ 459.) "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "It is settled law that section 654 bars punishment for both burglary and robbery where the sole purpose of the burglary was to effectuate the robbery." (*People v. Smith* (1985) 163 Cal.App.3d 908, 912 (*Smith*).) We believe the instant case falls squarely within the above rule.

Defendant was already present at the house when Dewayne and Dwight arrived. Defendant then left the house and returned a short time later carrying two guns, which he pointed at Dewayne and Dwight only. His sole purpose in entering the house the second time was to rob the victims of their personal belongings as retribution for Dewayne testifying against defendant's brother in an earlier criminal proceeding that resulted in his brother receiving a 44-year prison sentence.

Because the court imposed concurrent four-year sentences for each of the robberies against Dewayne and Dwight, section 654 prohibits imposing a concurrent two-year term for the burglary in count 1 since the burglary's only purpose was to carry out the robberies. (*Smith, supra,* 162 Cal.App.3d at p. 912.) It also prohibits imposing a concurrent four-year term for the section 12022.5, subdivision (a) enhancement attached to count 1. (*Id.* at p. 914 [when the sentence for the underlying offense of burglary is stayed, no "punishment" is imposed, and, therefore, the attached gun enhancement must also be stayed].) The concurrent sentences for the burglary in count 1 and its firearm enhancement should have been imposed and stayed under section 654. (*Ibid.*)

Defendant also pleaded no contest to carjacking (§ 215, subd. (a), count 5) and unlawfully taking a vehicle (Veh. Code, § 10851, subd. (a), count 6). The court used the carjacking in count 5 as the base term for sentencing. It imposed the midterm of five years, plus a 10-year firearm enhancement under section 12022.53, subdivision (b). The court imposed a concurrent two-year sentence for unlawfully taking a vehicle as alleged in count 6.

A person is guilty of unlawfully taking a vehicle whenever he drives or takes a vehicle, without the vehicle owner's consent, and with the intent to deprive the owner of title or possession of the vehicle either permanently or temporarily. (Veh. Code, § 10851, subd. (a).) A person is guilty of carjacking whenever, through force or fear, he takes a vehicle in another's possession against that person's will and with the intent to either

21

permanently or temporarily deprive the person of possession of the vehicle. (§ 215, subd. (a).)

Here, not only was Dwight the person in possession of the car but he was also the car's owner. In taking the vehicle, defendant possessed the single intent or objective of depriving Dwight of the car. Given this singular intent, defendant cannot be punished for both offenses under section 654. Having imposed the sentence for carjacking in count 5, the court should have imposed and stayed the two-year sentence for unlawfully taking Dwight's vehicle in count 6. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 ["to implement section 654, the trial court must impose sentence on all counts, but stay execution of sentence as necessary to prevent multiple punishment[s]"].)

DISPOSITION

The trial court is directed to modify the judgment so that the sentence for burglary and the associated firearm enhancement under section 12022.5, subdivision (a), as well as the sentence for unlawfully taking a vehicle in violation of Vehicle Code section 10851, subdivision (a), are imposed and stayed pursuant to section 654. The court shall amend the abstract of judgment accordingly and forward a copy thereof to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


    HULL     , J.


We concur:


    BLEASE    , Acting P. J.


    NICHOLSON   , J.


22